# UNITED STATES DISTRICT COURT
for the
Eastern District of Pennsylvania

| | |
|---|---|
| United States of America<br>v.<br>**RALPH JOHNSON**<br><br>_Defendant(s)_ | )<br>)<br>)   Case No. 20-mj-1418<br>)<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __July 18, 2018 to Sept. 24, 2019__ in the county of __Philadelphia__ in the __Eastern__ District of __PA & elsewhere__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Section 201(b)(2)(A) | Bribery of public official |

This criminal complaint is based on these facts:

Between on or about July 18, 2018 and on or about September 24, 2019, in the Eastern District of Pennsylvania and elsewhere, defendant RALPH JOHNSON corruptly sought, accepted, and agreed to accept money in return for being influenced in the performance of an official act, by steering purchase orders and contracts to companies and accepting funds from those contracts and purchase orders from individuals associated with those companies as kickbacks, in violation of 18 U.S.C. § 201(b)(2)(A). See attached Affidavit.

☑ Continued on the attached sheet.

_/s/ Brett Nelson_
_Complainant's signature_

Brett Nelson, Special Agent, VA OIG
_Printed name and title_

Sworn to before me and signed in my presence.

Date: __August 24, 2020__

_/s/ Timothy R. Rice_
_Judge's signature_

City and state: __Philadelphia, PA__   Honorable Timothy R. Rice
_Printed name and title_

# AFFIDAVIT IN SUPPORT OF AN
# APPLICATION FOR AN ARREST WARRANT

I, Brett Nelson, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the United States Department of Veteran Affairs, Office of Inspector General ("VA OIG") in West Palm Beach, Florida, and have been so employed since July 22, 2018. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

2. This affidavit is submitted in support of a complaint and arrest warrant for RALPH JOHNSON, the Chief of Environmental Services Management at the Philadelphia Veterans Affairs Medical Center ("Philadelphia VAMC"), located at University and Woodland Avenues, Philadelphia, PA, for violations of Title 18, United States Code, Section 201(b)(2)(A) (bribery of public officials).

3. For the reasons stated below, there is probable cause to believe that RALPH JOHNSON has committed criminal activities, including seeking, accepting and receiving money, including receiving money via mail, in return for awarding contracts with the Philadelphia VAMC Environmental Service Management department for amounts well in excess of the value of the services to be performed under those contracts, and steering purchase orders to specific companies in exchange for kickbacks in violation of 18 U.S.C. §§ 201(b)(2)(A).

## AGENT BACKGROUND

4. Prior to being a VA OIG Special Agent, I served in the United States Army as a Special Forces Weapons Sergeant for more than seven years. While in the Army, I deployed twice to Afghanistan in support of Operation Enduring Freedom and once to Tajikistan in support of counter narcotics and terrorism operations

5. I am currently assigned to the VA OIG Southeast Field Office in West Palm Beach, Florida, where I am responsible for conducting criminal investigations into crimes committed against the programs and operations of the United States Department of Veterans Affairs ("the VA").

6. I have participated in criminal investigations and have participated in all aspects of those investigations, to include conducting physical and electronic surveillance, analyzing financial records, and analyzing subscriber and telephone toll information obtained as a result of subpoenas. Further, I have conducted and participated in search warrants, arrest warrants, and interviews of witnesses and subjects.

7. As a result of my training and experience, I am familiar with the tactics, methods and techniques of criminals to communicate with each other, including the use of cellular telephones, text messaging, emails and mail, in connection with their criminal activity.

## INVESTIGATION BACKGROUND

8. I base this affidavit on my personal investigation and the investigation of other VA OIG Special Agents. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrant and does not set forth all of my knowledge about this matter.

9. I am one of the case agents assigned to the criminal investigation of RALPH JOHNSON. The information contained within this affidavit is based on my training and experience, as well as my review of documents, source information, recorded conversations, and information and experience imparted to me by other law enforcement officers. Because this affidavit is being submitted for the limited purpose of establishing probable cause to arrest, I have not included each and every fact known to me concerning this investigation.

**Background of Investigation**

10. In July 2015, the VA OIG began investigating allegations that multiple VA employees at various VAMCs were being paid kickbacks by vendors to place purchase orders and service contracts with those vendors. Two individuals under investigation, who later became cooperating witnesses ("CW1" and "CW2"),[1] were participants in these kickback schemes.

11. In meetings in May and June 2019 and August 2020, CW1 and CW2 told VA OIG Special Agents that, beginning in 2018, acting on behalf of their companies ("Company A" and "Company B"), they travelled to Philadelphia, PA, on a regular basis and paid kickbacks, totaling more than $100,000, to RALPH JOHNSON in Philadelphia, PA, in exchange for purchase orders and contracts with the Philadelphia VAMC under which Company A and Company B received payment for goods provided to the Philadelphia VAMC and received payment for services well in excess of the worth of services provided.

---

[1] On March 13, 2020, CW1 and CW2 each entered a guilty plea to one count of conspiracy to commit health care fraud in the Southern District of Florida. CW1 and CW2 have not yet been sentenced on that charge and hope to get a benefit from the government through their cooperation with the VA OIG investigation.

12. According to CW1 and CW2, RALPH JOHNSON told them what price to quote for services, and, for contracts, told them the amount to bid and what information to include in their bid on each contract to ensure that Company A would be awarded the contract.

13. For purchase orders for services at the Philadelphia VAMC, RALPH JOHNSON instructed CW1 and CW2 to use veterans in the Compensated Work Therapy ("CWT veterans") program, a clinical vocational rehabilitation program at the VAMC, to perform the services under the purchase order for which those veterans were paid approximately $11.00 per hour, and, if CW1 and CW2 could not find a CWT veteran to perform the work, JOHNSON would take care of finding a CWT veteran to do the work.

14. RALPH JOHNSON also told CW1 and CW2 who to contact at the Philadelphia VAMC for payment of purchase orders.

15. I learned from VAMC purchasing records that, from on or about July 18, 2018 to on or about September 19, 2019, Company A and Company B were awarded more than $2 million in purchase orders with the Philadelphia VAMC, mainly for the Philadelphia Environmental Service Management department overseen by RALPH JOHNSON. As the manager for the Environmental Management Service at the Philadelphia VAMC, JOHNSON was able to direct the purchasing staff as to what companies to use to obtain goods and services for the department through purchase orders. His position as manager enabled JOHNSON to steer those purchase orders to Company A and Company B. CW1 and CW2 told VA OIG Agents that they paid kickbacks to JOHNSON for the purchase orders his department placed with Company A and Company B.

16. I have learned, from Philadelphia VAMC purchasing records, that, from on or about December 27, 2018 to on or about September 24, 2019, CW1 and CW2, through Company A, were awarded five service contracts, with a total award value of $1, 043,035, all related to the Philadelphia VAMC Environmental Service Management department overseen by JOHNSON.[2]

17. I have confirmed that RALPH JOHNSON served as the Contracting Officer's Representative ("COR") on each of the contracts awarded to Company A at the Philadelphia VAMC, which allowed JOHNSON to be heavily involved in all aspects of those contracts including drafting the scope of work needed to be performed, and providing technical expertise, pre-award review, technical review and recommendations as to whom the contract should be awarded, project management, and payment on invoices. For example, for a window washing contract awarded to Company A for $69,383 for which JOHNSON was the COR, JOHNSON had submitted a Justification and Approval for Other than Full and Open Competition, certifying that only one responsible source and no other supplies or services will satisfy agency requirements and that there was unusual and compelling urgency, and stating: "EKNO provides a service that is effective and efficient. They work weekends with excellent availability. If needed, EKNO is available to begin providing services the next day."

---

[2] Three of these contracts were set-aside contracts for Service-Disabled Veteran Owned Small Businesses ("SDVOSB"). CW1 and CW2 operated Company A as an SDVOSB, but Company A was not a legitimate SDVOSB and therefore was not entitled to bid on these contracts or to be awarded these contracts.

18. I learned from CW1 and CW2 that they had an ongoing and regular schedule as to when they were to pay the kickbacks to RALPH JOHNSON, and CW1 and CW2 had telephone conversations and text messages with JOHNSON to arrange each kickback payment, most of which were paid to JOHNSON in person at the Philadelphia VAMC.

**Current Investigation**

19. On or about June 13, 2019, at the direction of VA OIG special agents, CW1 and CW2 met with RALPH JOHNSON at the Philadelphia VAMC to pay JOHNSON one of the regularly scheduled kickbacks.

20. Prior to the meeting, VA OIG special agents provided CW1 and CW2 with $5,000 in cash to give to JOHNSON as a kickback.

21. During that meeting, which took place in JOHNSON's office at the Philadelphia VAMC and was audio and video recorded, the following occurred:

    a. CW2 handed JOHNSON a binder containing the $5,000 in cash and told JOHNSON that there was something in the binder for him;

    b. JOHNSON took the binder and asked CW1 and CW2 to retrieve his bag that was hanging on the wall behind CW1 and CW2;

    c. JOHNSON then placed his bag at his feet and reached into the binder, stating: "Go from one spot to another spot, right? And then be done with it."

    d. JOHNSON was not able to find the money in the binder and instructed CW2: "Put it where it needs to be so I can get it out."

    e. CW2 retrieved the binder, unzipped it and gave it back to JOHNSON.

6

  f. JOHNSON removed the $5,000 in cash from the open binder and placed the cash in his bag.

  g. This recorded discussion confirmed what CW1 and CW2 previously told VA OIG agents about their payment of cash kickbacks to RALPH JOHNSON. I understand that, in this instance, CW1 and CW2 gave the $5,000 in cash to JOHNSON as a kickback so that they would continue to receive purchase orders and contracts from the Philadelphia VAMC through JOHNSON.

22. JOHNSON and CW1 and CW2 left JOHNSON's office and continued to talk in the north parking lot of the Philadelphia VAMC, discussing the following:

  a. JOHNSON noted that the 4th of July was coming up and asked about the first or second of the month, telling CW1 and CW2: "It's just how I got to go around and pay myself . . . I've got to make sure y'all good to pay me."

  b. JOHNSON also said to CW1 and CW2: "That's going to be a long weekend . . . and I like to enjoy the weekend, . . . I like to work hard, but I sure like to play hard too."

  c. CW1 offered to fly to Philadelphia, but JOHNSON said: "[J]ust shoot it to me," and CW1 replied: "Done deal."

  d. JOHNSON also said to CW1 and CW2: "So, so y'all good with not – nothing coming out of y'all pocket, that's – and I always have said – well, maybe I need to make it clear that no nothing be coming from y'all." JOHNSON continued: " Y'all got a business to run. Y'all in business. We in business together, right?"

  e. I understood that these statements made by RALPH JOHNSON were intended to reaffirm that the kickback payments made by CW1 and CW2 to JOHNSON for

awarded contracts and purchase orders were coming from the payments from the VA under the contracts and purchase orders with Company A and Company B, to schedule the next kickback payment, and to ensure that the corrupt agreement between CW1, CW2, and JOHNSON continued.

23. On or about June 28, 2019, RALPH JOHNSON sent a text message to CW2, asking CW2 to tell CW1 not to "forget about the second of July."

24. On or about July 2, 2019, VA OIG special agents, acting as CW1 and CW2, sent, via UPS, an envelope containing $3,000 in cash as a kickback payment from Florida, where CW1 and CW2 resided, to RALPH JOHNSON at his home address in Kinzers, PA.

25. On or about July 3, 2019, CW2 sent a text message to RALPH JOHNSON, asking JOHNSON to verify his address so the package could be tracked, and JOHNSON responded, via text message with his name and home address in Kinzers, PA. The envelope containing the $3,000 in cash was delivered to JOHNSON's residence on or about July 3, 2019.

26. On or about July 9, 2019, RALPH JOHNSON confirmed receipt of the envelope and the $3,000 in cash via the following text messages with CW2:
    a. CW2 sent a text message to JOHNSON: "Good morning!!! Did you ever get the money?"
    b. JOHNSON responded to CW2" "Yes, I did."

27. On or about August 14, 2019, at the direction of VA OIG special agents, CW1 and CW2 met with RALPH JOHNSON in a suite at the Hilton Bonnet Creek Hotel in Orlando, FL, during a Veterans Health Administration Environmental Programs Services training

event and vendor fair. This meeting was audio and video recorded and the following conversation took place between JOHNSON and CW1 and CW2:

a. JOHNSON and CW1 and CW2 discussed a payment to be made to JOHNSON wherein JOHNSON asked: "So, so, would five be alright?," and CW1 told JOHNSON that their accountant had instructed them not to do any cash transactions, saying: "I just have to figure out some way to get it to you."

b. JOHNSON suggested that CW1 and CW2 write a check, to which CW2 responded: "Can't write a check in your name RALPH JOHNSON."

c. JOHNSON discussed "the tree contract," telling CW1 and CW2: "The only thing I am asking is for 10 on that . . . then the 74 is ya'll. . . . But the only thing y'all got to do is have somebody visit come cut down the . . . and trim . . . $4,000

d. CW2 asked: "But 10 for you?," to which JOHNSON replied: "Yeah," and he elaborated that CW1 and CW2 would pay landscapers $4,000 to do the work under the contract: "[O]ne of y'all have $4,000 coming through under the . . . . He gets it. . . . And I'll bring the, the dumpster and they'll be seeing that we're doing something so we'll leave the dumpster for about three weeks and start loading it and come get it."

28. At the end of the meeting, RALPH JOHNSON reminded CW1 and CW2: "Hey, y'all. We, we partners." Based upon JOHNSON's statements, previous observations of JOHNSON being paid kickbacks by CW1 and CW2, and statements CW1 and CW2 made to VA OIG Agents about their past relationship of paying JOHNSON kickbacks,

9

VA OIG Agents understood that JOHNSON reaffirmed the kickback scheme and his role in it with CW1 and CW2.

29. I have confirmed that there was a contract solicitation for tree trimming service at the Philadelphia VAMC, contract solicitation number 36C24419Q0614. The contract scope of work included pruning and trimming 200 trees and bushes around the Philadelphia VAMC property. RALPH JOHNSON was the contracting officer's representative for the contract and that contract, No. 36C24419P0797, had been awarded to Company A on August 12, 2019 with an obligated amount of $84,000. He was also listed as the primary contact person on the Statement of Work for the contract.

30. The obligated amount under this contract far exceeded the value of the actual scope of work to be done, as JOHNSON told CW1 and CW2 that the work could be performed by landscapers for $4,000, with the bulk of the funds from the contract to be distributed as follows: $10,000 to be paid by CW1 and CW2 to JOHNSON as a kickback; and $70,000 in proceeds to CW1 and CW2.

## CONCLUSION

31. Based on the above facts, my training and experience and the training and experience of other agents with whom I work, I have probable cause to believe that RALPH JOHNSON, a federal employee, did corruptly demand, seek, accept, receive, and agree to receive and accept personally money in return for being influenced in the performance of an official act, by steering purchase orders, as well as contracts in amounts far in excess of the actual value of the work or services under those contracts, to Company A and Company B and accepting funds from those contracts and purchase orders from CW1 and CW2 as kickbacks, in violation of 18 U.S.C. § 201(b)(2)(A) .

        Respectfully submitted,

        /s/ Brett Nelson

        Brett Nelson
        Special Agent
        United States Department of Veterans Affairs
        Office of Inspector General

Subscribed and sworn to before me
on August __24th__, 2020:

/s/ Timothy R. Rice
HONORABLE TIMOTHY R. RICE
UNITED STATES MAGISTRATE JUDGE